IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 1:14cr639-WKW |
| | ) | |
| JANET LYNN FLOWERS | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on defendant Janet Lynn Flowers' motion to suppress (Doc. # 17) and the government's response (Doc. # 22). For the reasons set out below, the court concludes that the motion is due to be denied.

**Facts**

Defendant Flowers seeks to suppress any "items seized, statements made, and any fruits of those items and statements, obtained as a result of the search conducted at her residence on January 15, 2014." Doc. # 17 at 1. No incriminating statements made by defendant were brought to the attention of the court; however, defendant apparently did give a recorded statement that is reflected in the exhibits submitted at the suppression hearing in this case. G. Ex. 9. During the search in question, officers also found and seized at defendant's residence, *inter alia*, several different items containing methamphetamine; some ecstasy, alprazolam, and diazepam pills; drug paraphernalia; a sawed-off .20 gauge shotgun; and a considerable number of allegedly stolen tools.

On the date of the search, defendant was serving a three-year term of probation imposed following a 180-day custody sentence on a March 21, 2011 conviction from the

Circuit Court of Henry County, Alabama, for unlawful possession of a controlled substance. G. Ex. 5. She began her probation on November 4, 2011. G. Ex. 7. Defendant's 2011 order of probation required, *inter alia*, that defendant must "[p]ermit the Probation Officer to visit [her] at home or elsewhere," and must "[s]ubmit to searches by the Probation Officer of [her] person, residence, vehicle, or any property under [her] control." G. Ex. 6. On February 27, 2012, defendant signed an acknowledgment that these "instructions and conditions have been explained to me. I have received a copy of this order, I understand the conditions, and I agree to abide by them." Id. On February 28, 2012, Probation Officer Kenneth Brown verified that "[a] copy of [the probation conditions] has been delivered to the probationer, who has been instructed regarding this order." Id.

On January 14, 2014, a middle-aged white male informant asked to see William Maddox, the sheriff of Henry County, with a complaint about the defendant. The informant was not an anonymous tipster; he gave his name, but neither Sheriff Maddox nor any other officer involved remembers that name now, and no written record was kept of the complaint or the meeting itself. Maddox testified that he receives tips from informants daily.

Maddox invited Investigator Steve Sanders, who happened to be in the office that day, to join him in speaking with the informant. Sanders was the sergeant in charge of the Henry County/Abbeville Criminal Investigative Unit, and he primarily worked narcotics at the time. The informant complained that defendant had taken his property – he said that he had left a trailer at the residence, and some of the tools and other equipment in the trailer had

disappeared. He also said that he had information about some narcotics at defendant's residence. The informant indicated that he had resided at the house with defendant and had recent firsthand knowledge of the information he was providing.

The informant brought with him to the meeting a detailed map that he had drawn showing the layout of Flowers' residence, with a second page noting the outbuildings on the property. G. Ex. 15. On this map, the informant indicated where he believed the narcotics could be found, as well as the location of a sawed-off shotgun and a .22 rifle. Specifically, he showed Maddox and Sanders an area in the living room where he said they would find drug paraphernalia such as methamphetamine pipes, and also pointed out the location of a small hutch or cabinet where the weapons would be stored in the dining room. In addition, the informant told Maddox and Sanders about an old barn and shed at the back of the house where he thought stolen property including tools, weed eaters, lawn mowers, and chain saws would be located, either buried or stored in a back room.

Sheriff Maddox was aware that defendant was on probation. Sanders had also previously received information that illegal narcotics were being distributed from defendant's residence. Maddox and Sanders indicated to the informant that they would let defendant's probation officer know about the information that he had provided, and the probation officer would take whatever action he felt was necessary. The officers testified that when a complaint comes in concerning someone on probation, the Henry County sheriff's office routinely refers it to the probation officer first and lets him take charge. The sheriff's office

is small; the population of Henry County is around 17,000, and there are only 15 officers in the Sheriff's office, counting the Sheriff. In addition, the referral is routinely made to the probation officer because that officer is the one who knows the probationer best and is in charge of his or her supervision.

Kenneth Brown is the only state probation and parole officer for Henry County. He began supervising defendant in 2013. His office is in Abbeville, in the same building as the Sheriff's office. After their conversation with the informant, Maddox and Sanders went to Brown's office and relayed what the informant had told them, and provided Brown a copy of the map. The sheriff and other law enforcement agents routinely give Brown information on his probationers. Brown recalls that Maddox and Sanders specifically indicated that defendant would be in possession of some drugs, some firearms – including a sawed-off shotgun – and possibly some stolen property. They gave Brown the map of the residence provided by the informant, and Brown understood that informant was an acquaintance of defendant who may have lived there. The sheriff pointed out to Brown the area on the map where the drugs and stolen property would be found, and also the location of the sawed-off shotgun. Specifically, Brown was told that the drugs would be in the living room in the area of two chairs and a table that were marked on the map, and that the sawed-off shotgun would be in a cabinet in a small foyer area that was also marked on the map. Brown understood that Maddox and Sanders had spoken personally with the informant. He was aware of defendant's prior conviction for second degree murder, G. Ex. 1, and her conviction for unlawful

possession of a controlled substance. G. Ex. 2; G. Ex. 5.[1] The sheriff did not instruct Brown to do anything in particular with the information; he told Brown to do whatever he felt he needed to do and left. Maddox and Sanders did not tell Brown about prior rumors that narcotics were being distributed from the residence.

Unless there are exigent circumstances, the policies and procedures of the Alabama Board of Pardons and Paroles require a probation officer to request permission before conducting a search. After the visit from Maddox and Sanders, Brown sent his district manager, Rodney Peak, an email requesting permission to search Flowers' residence for drugs, possible stolen property, and a sawed-off shotgun. Peak was out of the office that afternoon, so he did not immediately pick up the email. Brown called Peak around 9 a.m. on the morning of January 15 and orally requested permission to search, and received authorization. According to Peak's notes, Brown sought permission to search defendant's residence due to having a reliable person who had lived with defendant tell him[2] that she had guns and drugs at her residence. Peak approved the search primarily based on the information that the offender had a sawed-off shotgun. He said that a weapon raises the concern to a

---

[1] There actually were two controlled substance convictions; one in September, 2010, and one in March, 2012. Id. The second of these also represented a violation of probation. The court finds that, as defendant's probation officer, Brown would have been aware of defendant's full record.

[2] Peak's notes suggest that Brown told him that he had spoken directly with the informant; however, that was not the case. Peak testified that he made this note at about 4:30 p.m. that afternoon from memory, and that it was possible that he had mis-remembered the conversation. Peak does not recall with certainty whether he looked at Brown's email or not before giving permission to search, although he testified that he "probably did."

5

higher level – without the weapon, he might have directed that defendant be drug-tested and a home visit be conducted with a walk-through for drugs rather than a search.

Brown next met with Steve Culbreath, who was in the courthouse at the time, and asked if Culbreath would accompany him to defendant's residence. Culbreath is the commander of the Henry County/Abbeville Police Department Task Force, which investigates drugs, property crimes, and major crimes. Brown wanted back-up for his safety, and also because he would be searching the residence of a female. He normally asks a law enforcement officer to accompany him – most often, one of the Sheriff's deputies, who are close by – because he is the only probation officer in Henry County. Culbreath had assisted Brown on several other occasions on visits to probationer's homes. Culbreath told Brown that he did not have anything else going on, and would not mind coming with him as back-up. The Sheriff did not instruct Culbreath to go with Brown.

Brown and Culbreath traveled to defendant's residence, where they encountered defendant and a woman named Ashley Griggs.[3] Culbreath remained outside in the yard with Griggs. Brown and defendant went inside the house. Brown did not escort defendant into the residence; he testified that "[w]e just chitchatted and she said, come on in, and we went in."

---

[3] Brown originally characterized his trip to defendant's residence as a "home visit." A home visit is typically a routine walk-through to check on the probationer's residence and make sure that the probationer is still living there and that there is no contraband visible; however, probation officers also sometimes refer to any kind of visit or contact at a probationer's home as a "home visit." In this instance, the court finds that Brown did not travel to defendant's residence for a routine home visit, but for the express purpose of searching the residence based on what he believed was reasonable suspicion that she was violating the law and the terms of her probation.

The house was cluttered, with items piled chest high, and a narrow path leading from the main door to a seating area. Brown and defendant walked to the seating area, where he observed a glass smoking device and drug paraphernalia on a table between the two chairs. These were in the location that had been pointed out to him on the map by the sheriff. Brown also observed that there was a black metal box underneath a table in the same area. He retrieved the box, opened it, and saw a white crystal substance in a clear plastic container inside the box, which he did not open. The time that elapsed between Brown's entry into the house and his discovery of the methamphetamine was less than 10 minutes.

Brown took Flowers into custody for violation of her probation. He called in Culbreath and turned the scene over to the Henry County/Abbeville PD Task Force, because he had no way of gathering evidence and because probation officers are instructed that if they find contraband that represents a violation of the law, they should contact the relevant law enforcement agency to come and make a case on it. Culbreath in turn called Sergeant Steven Sanders because Sanders was a narcotics officer, and Sanders came out and conducted a field test. The substance in the plastic container tested presumptively positive for the presence of methamphetamine. By the time that Sanders arrived, a .22 Marlin rifle had been located by Culbreath and/or Brown in the cabinet which had been pointed out on the map by the informant, but the weapon had been left in the cabinet.

Sanders then contacted another officer who was in Abbeville – Michael Neiswanger, a member of the Henry County Investigative Unit Task Force – and asked him to seek a

search warrant. Sanders told Neiswanger that they had located drug paraphernalia and methamphetamine, and he also mentioned the guns.[4] He did not conduct any further search after locating the methamphetamine.

Neiswanger proceeded to secure a search warrant from Judge Derek Peterson. He called the officers who were at defendant's residence and told them that he had a warrant signed by a judge, and that he was *en route*. Neiswanger and other officers then searched the residence and outbuildings and located more methamphetamine and other drugs, more drug paraphernalia, and also possibly stolen tools. In addition, they found a sawed-off shotgun deeper in the cabinet in the residence where the .22 rifle had been discovered. This prosecution followed.

## Discussion

Defendant Flowers contends that Probation Officer Kenneth Brown did not have reasonable suspicion to justify the warrantless search of defendant's residence; that Brown improperly served as a "stalking horse" for law enforcement – that is, his "home visit" was a ruse to circumvent defendant's Fourth Amendment rights; and that the warrant application was not supported by probable cause.[5] Doc. #17 at 4. The court considers each of these

---

[4] Neiswanger understood Sanders to indicate that there was more than one firearm. However, the sawed-off shotgun had not yet actually been located at this time, although Sanders had heard earlier from the informant that one would be found at the residence.

[5] The defendant conceded at the suppression hearing that if the probation officer's initial search was in keeping with the Fourth Amendment, then the subsequent search warrant was supported by probable cause. For its part, the government conceded at the suppression hearing that if the probation officer's search violated the Fourth Amendment, "then the warrant was tainted and

contentions in turn.

1.	<u>Reasonable suspicion</u>

In <u>U.S. v. Carter</u>, 566 F.3d 970 (11th Cir. 2009), the Eleventh Circuit addressed the standard to be applied in assessing whether a warrantless search of a probationer's home violates the Fourth Amendment. The <u>Carter</u> court recognized that in <u>United States v. Knights</u>, 534 U.S. 112 (2001), "the Supreme Court held that the warrantless search of a probationer's house was permissible even though it was supported by only a reasonable suspicion that criminal conduct was occurring, and not probable cause. ...The Court stated that the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." <u>Carter</u>, 566 F.3d at 974 (citations and internal quotation marks omitted). "The *Knights* Court then considered Knights's individual privacy interests. The Court noted that, as a probationer, Knights did not enjoy the same amount of liberty that other citizens do... . The Court also noted that Knights's probation had a search condition requiring him to submit his residence to warrantless searches.*"* <u>Carter</u>, 566 F.3d at 974 (citations omitted).

"The Court then considered the governmental interests at stake. It first noted that probationers are more likely to commit crimes than other citizens, and the government therefore has an interest in keeping close watch over them. ... Furthermore, probationers have

---

everything subsequent ... is subject to suppression." Thus, the court's decision as to the first two issues raised here will decide the third issue, as well.

a greater incentive to conceal the evidence of their crimes because they are subject to greater scrutiny than the average citizen. ...The *Knights* Court then concluded that the search of Knights's home based on reasonable suspicion was permissible because Knights had a reduced privacy interest and the government had a strong interest in combating crime by probationers." Carter, 566 F.3d at 974 (citations omitted).

Just as in the Carter case, it is clear in the instant case that, as a probationer, defendant Flowers does not enjoy the absolute liberty to which every citizen is entitled, but only conditional liberty dependent upon her observance of special probation restrictions. See U.S. v. Yuknavich, 419 F.3d 1302, 1308 (11th Cir. 2005). In addition, in order to succeed on her application for probation, defendant here agreed to a search condition requiring her to "[p]ermit the Probation Officer to visit [her] at home or elsewhere," and "[s]ubmit to searches by the Probation Officer of [her] person, residence, vehicle, or any property under [her] control." G. Ex. 6; see Knights, 534 U.S. at 118 (consent is a salient factor in assessing defendant's reasonable expectation of privacy under the totality of the circumstances test). Thus, the court concludes that defendant had a significantly reduced expectation of privacy in her home at the time of the search. In addition, the same legitimate governmental interests support the search in this case as in Knights, Carter, and Yuknavich and similar cases. Further, as in Carter, defendant has a history of drug and violence-related felonies,[6] which makes the government's interest in monitoring the probationer particularly high. Carter, 566

---

[6] See *supra*, note 1; G. Ex. 1 (second degree murder conviction).

F.3d at 974-975. Thus, the officers in the instant case required no more than reasonable suspicion to conduct a search of the probationer's house. See Yuknavich, 419 F.3d 1309-1310.

"[A] court must look to the 'totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.' .... To determine whether officers had reasonable suspicion, [the court] 'must take stock of everything they knew before searching.'" U.S. v. Gomes, 279 Fed.Appx. 861, 870, 2008 WL 2212000, 8 (11th Cir. 2008)(citations omitted)(unpublished). "The Eleventh Circuit has stated that '[w]hether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable officer at the scene.' ...The determination is based upon an examination of the 'totality of the circumstances,' but the subjective motives of the officer are immaterial. ..." Madaio v. Franklin, 2014 WL 130462, 4-5 (N.D. Ala. 2014) (citations omitted) (unpublished). An officer's knowledge of a probationer's past criminal convictions and probation violations is a relevant factor in determining whether he had reasonable suspicion to search the probationer's person or his property. See id. at *4 and n.10; see also Yuknavich, 419 F.3d at 1310.

In the case before the court, Brown was personally acquainted with and had previously supervised the defendant. He was aware that she had a prior conviction for second degree murder, and two convictions for unlawful possession of a controlled substance, one of which constituted a probation violation. He had received information from Maddox and Sanders – well-known, trained, and reliable sources who could be trusted to repeat information

accurately – concerning the statement of an informant who had appeared in person at the sheriff's office, and who possessed firsthand knowledge that defendant was currently in possession of drugs and firearms, including a sawed-off shotgun, as well as stolen property.[7] Brown also received a detailed map of the residence provided by the informant, whom he understood to be an acquaintance of defendant who had lived with her at her residence. In addition, Brown was aware of, and could personally observe, the fact that the informant had marked specific areas on the map where he indicated that contraband would be found.

"Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and less than probable cause, which is a fair probability that contraband or evidence of a crime will be found." U.S. v. Henderson, 145 Fed.Appx. 346, 351 (11th Cir. 2005)(citation and internal quotation marks omitted) (unpublished). In the

---

[7] Maddox and Sanders, in turn, acquired their information from a source with whom they were not previously acquainted, but who nevertheless gave his name and appeared at the sheriff's office in person, with no evident personal stake in making a complaint other than to secure the return of his property. The informant had recent personal knowledge of the matters he addressed, having lived at the residence himself, and had the kind of inside information that comes from a special familiarity with defendant's affairs which the general public could not have acquired. His knowledge was detailed and precise, and he was able to draw a map of the residence and outbuildings and pinpoint exact locations of contraband. Sheriff Maddox knew that defendant was on probation for another offense, and Sanders had previously received information that illegal narcotics were being distributed from defendant's residence. While Maddox and Sanders acknowledged that they could not be completely certain of the reliability of the informant, their knowledge was sufficient to form a reasonable suspicion and to turn the matter over to the probation officer for further action. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

context of probation, "it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases–especially those involving drugs or illegal weapons–the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances." Id. (citing Griffin v. Wisconsin, 483 U.S. 868, 879 (1987).

In the instant case, the court has no hesitation in concluding that Brown possessed the necessary reasonable suspicion to enter defendant's residence, an action which put him in a position to observe drug paraphernalia in plain view, exactly where the informant had said it would be. That observation contributed further reasonable grounds for the probation officer to pull out and look in the nearby box that proved to contain methamphetamine, which in turn supplied additional justification for the officers to determine that the .22 rifle was in the location noted on the informant's map. Under the totality of the circumstances, the court finds no Fourth Amendment violation here.

2.  "Stalking horse" theory

Defendant's second contention is that the probation officer's search was illegal

because it was merely a ruse or "stalking horse" for what was actually intended as a police investigation. In other words, defendant contends that Brown's search was undertaken at the request of and in concert with law enforcement officers, and maintains that Brown used his ability to search under a less stringent standard to help police evade the Fourth Amendment's warrant and probable cause requirements.

The court cannot agree. Even assuming that a "stalking horse" argument is still viable after the Supreme Court's decision in Knights, 534 U.S. 112 (2001), in which the Court ruled that in determining the constitutionality of a search of a probationer "there is no basis for examining [the] official purpose" of the search, id. at 122 – and many courts have decided that it is not[8] – the undersigned finds no evidence to support this theory in the instant case. Here, law enforcement officers did not instruct Brown to undertake a search. Two officers in an undermanned office – Maddox and Sanders – simply turned over information to Brown about his own probationer, and left it to him to determine what to do with it. Culbreath – a third officer, who received no instructions from the first two – then accompanied Brown to the residence because the probationer was female and because no other probation officer was available for back-up. Culbreath stayed outside during the initial search, and did not enter the

---

[8] See, e.g., U.S. v. Penson, 141 Fed.Appx. 406, 410, 2005 WL 1579499, 3 n. 2 (6th Cir. 2005)(unpublished); U.S. v. Stokes, 292 F.3d 964, 967 (9th Cir. 2002); U.S. v. Gibson, 2013 WL 5366133, 8-9 (S.D. Ohio 2013)(unpublished); U.S. v. Lykins, 2012 WL 1947346, 12 n. 7 (E.D. Ky. 2012)(unpublished); U.S. v. Brown, 2009 WL 112574, 4 (M.D. Ala. 2009)(unpublished); see also U.S. v. Wasser, 586 Fed.Appx. 501, 503-505, 2014 WL 4783157, 3 (11th Cir. 2014)(unpublished).

residence until after defendant had been taken into custody. Brown had independent reasonable suspicion to search the residence, and it was his own supervisor Rodney Peak, not the sheriff, from whom he sought authorization. Nothing before the court demonstrates that the probation search was a subterfuge or that Brown acted as a stalking horse for other officers, and the court so concludes.

3.   Probable cause for the search warrant

As noted above, defendant conceded at the suppression hearing that if the probation officer's initial search was in keeping with the Fourth Amendment, then the subsequent search warrant was supported by probable cause. The court finds that probable cause clearly supported the issuance of the search warrant here.

**Conclusion**

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. # 17) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before May 28, 2015. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 14th day of May, 2015.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE